IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RONALD ALLEN CARTER                                                                          PLAINTIFF

v.                                              CIVIL NO. 15-5013

CAROLYN W. COLVIN, Acting Commissioner,
Social Security Administration                                                              DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Ronald Allen Carter, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff protectively filed his current application for DIB on August 20, 2012, alleging an inability to work since July 11, 2012, due to diabetes, scoliosis, leg pain, Balanitis Xerotica Obliterans (BXO), hernia, dental problems, anxiety, and depressed feelings.  (Tr. 53-55).  An administrative hearing was held on August 21, 2013, at which Plaintiff appeared with counsel and testified.  (Tr. 22-52).

1

In a written opinion dated October 9, 2013, the ALJ found that the Plaintiff had the following severe impairments: hypertension, non-insulin dependent diabetes mellitus, and obesity. (Tr. 13). However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Tr. 13). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform the full range of light work as defined in 20 CFR 404.1567(b). (Tr. 14). With the help of vocational expert (VE) testimony, the ALJ also determined that Plaintiff would be able to perform his past relevant work. (Tr. 16). Ultimately, the ALJ concluded that the Plaintiff had not been under a disability within the meaning of the Social Security Act from July 11, 2012, through the date of the ALJ's decision. (Tr. 17).

Subsequently, on November 11, 2013, Plaintiff requested a review of the hearing decision by the Appeals Council. (Tr. 5-7). His request was denied on November 26, 2014. (Tr. 1-4). Plaintiff filed a Petition for Judicial Review of the matter on January 14, 2015. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 12, 13).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

**II.  Evidence Submitted:**

Plaintiff was born in 1972. (Tr. 27). He is six feet tall, weighs approximately 291 pounds, and lives in Fayetteville with his wife. (Tr. 27-28). His past relevant work consists of

fast food crew, fast food restaurant manager, sales associate, and maintenance/janitorial work. (Tr. 29-31).

On November 29, 2007, Plaintiff underwent an evaluation for urinary narrowing and urinary retention for a diagnosis of urethral meatal stenosis secondary to BXO. (Tr. 271-272). In the emergency room, a urethral meatal dilation was performed and a Foley catheter was inserted. Plaintiff tolerated the procedure well and was instructed to keep the catheter in place until his scheduled office visit the following week with Dr. Chad Brekelbaum at Northwest Arkansas Urology Associates. (Tr. 272). At a follow-up appointment with Dr. Brekelbaum on December 5, 2007, the catheter was removed and Plaintiff was informed that BXO was something that would reoccur and that he would likely need to perform self-dilation. (Tr. 268).

On November 1, 2011, Plaintiff was seen by Dr. Joe Rouse for pain in his abdomen (specifically in the lower left quadrant) and nausea. Dr. Rouse prescribed Nexium. (Tr. 384-385). Dr. Rouse noted in his report that Plaintiff's blood sugar was not adequately controlled, that he needed to lose weight, and recommended he see an endocrinologist. (Tr. 387). On November 7, 2011, Plaintiff was seen by Dr. Rouse for a follow-up visit for abdominal pain and an annual exam. Office notes demonstrate that Plaintiff's abdominal pain had improved. (Tr. 382-383). On January 5, 2012, Plaintiff saw Dr. Rouse for a follow-up of generalized abdominal pain and was given a renewed prescription of Nexium. (Tr. 380-381).

Plaintiff presented at Washington Regional Medical Center Emergency Room on May 27, 2012. He revealed that he had not been self-catheterizing as often as instructed and had noticed a lump in his urethra the night before. He complained that his urine had been somewhat

intermittent over the last few months, and he was unable to catheterize. When emergency room personnel were unable to catheterize, they called Dr. Nirmal Kilambi. In his records, Dr. Kilambi noted a history of smoking, hypertension and BXO. Dr. Kilambi was able to dilate and insert a Foley catheter into Plaintiff's bladder. Dr. Kilambi determined that Plaintiff suffered from concentric tightness of his urethra and recommended a urinalysis and culture. He also recommended Plaintiff follow up with Dr. Brekelbaum in one week. (Tr. 360-361).

On June 6, 2012, Plaintiff was seen for a follow-up with Dr. Brekelbaum. Dr. Brekelbaum's notes indicate tobacco cessation intervention was received. (Tr. 250). Plaintiff's Foley catheter was removed, and he was instructed to continue medication. Plaintiff was educated on the importance of consistency with daily urethral dilation, and instructed to return in one to two weeks for a cystoscopy to rule out more extensive urethral disease. (Tr. 254). At that office visit, Plaintiff completed a new patient history form on which he indicated symptoms of indigestion, heartburn, difficulty lying flat, scoliosis, back pain, joint pain, urinary frequency, and urinary hesitancy and weak stream. (Tr. 264).

Plaintiff was seen for a follow-up consultation with Dr. Brekelbaum on June 18, 2012. Dr. Brekelbaum's records indicate that Plaintiff smoked .75 packs per day and was provided smoking cessation counseling. (Tr. 246). During the visit, Plaintiff was prepped for a cystoscopy to further evaluate his urethra and concern of proximal stricture disease. However, Plaintiff chose to forego the procedure because his symptoms had improved. Dr. Brekelbaum emphasized the importance of daily urethral meatal dilation and encouraged him to follow up with him as needed. (Tr. 249).

On July 12, 2012, Plaintiff complained to Dr. Rouse of nausea, vomiting blood (hematemesis), weakness and fatigue. Dr. Rouse prescribed Carafate and Dexilant, refilled the Nexium prescription, and ordered blood work. (Tr. 378-379). Later that day, Plaintiff was transported to the emergency room at Washington Regional Medical Center via ambulance with complaints of severe upper abdominal pain, vomiting, and abdomen pain. He was hyperventilating and very thirsty. (Tr. 332-335). A CT scan with contrast of the abdomen revealed fatty infiltration of the liver, horseshoe kidney, normal appendix, umbilica hernia and no other abnormalities. (Tr. 347). A chest x-ray on July 12, 2012, revealed poor aeration of the lungs without focal airspace disease. (Tr. 349-350). A second chest x-ray on July 13, 2012 showed right subclavian venous catheter with tip over the superior vena cava; no pneumothorax; and poor aeration of the lungs with questionable pulmonary edema. (Tr. 348-349). A follow-up chest x-ray on the same day showed a resolution of the edema. (Tr. 348). While in the hospital, Plaintiff underwent a procedure to drain an abscess on Plaintiff's upper left thigh (Tr. 319), as well as a procedure to insert a right subclavian central venous catheter, as shown on the second chest x-ray. (Tr. 321, 348-349). While hospitalized, Plaintiff's blood sugar was fairly difficult to control, but was stable at discharge. (Tr. 313). His discharge paperwork completed by Dr. Gordon Parham listed multiple diagnoses of diabetic ketoacidosis, new onset diabetes mellitus, acute kidney injury improved, abscess on left thigh, hematemesis without anemia, horseshoe kidney, and obesity. (Tr. 312). Plaintiff saw Dr. Rouse on July 18, 2012, for a check-up after the recent hospital visit. Dr. Rouse ordered a repeat of lab work in five days, a follow-up office visit again in one week, and a refill of Plaintiff's diabetic test strips prescription. (Tr. 377).

On July 23, 2012, Plaintiff was taken to the Washington Regional Medical Center Emergency Room with complaints of sudden onset of abdominal pain in the right lower quadrant, chills, diarrhea and nausea. (Tr. 280-283, 392). CT scan findings showed a diffusely dypodense liver suggesting hepatic steatosis, a horseshoe kidney, and a mildly thickened appendix. Such findings were indicative of early acute non-ruptured appendicitis. (Tr. 299). Plaintiff's hematology report showed a high white blood cell count, high glucose levels and low sodium levels. (Tr. 310). Glucose levels were also high when checked twice daily on July 23rd and 24th during Plaintiff's hospital stay. (Tr. 311). An ultrasound showed a fatty liver, normal gallbladder, and horseshoe kidney with prominent column of bertin on the right. (Tr. 300). After testing confirmed appendicitis, Plaintiff's appendix was removed. (Tr. 284). The operating report notes a history of scoliosis, astigmatism, years of urine issues and a new diagnosis of diabetes. (Tr. 286). Plaintiff's pathology report from July 25, 2012, confirmed the diagnosis of acute appendicitis and periappendicitis. (Tr. 298). Dr. Jeffrey Kellar's past review notes on Plaintiff also remarked that he was morbidly obese. (Tr. 392).

On July 27, 2012, Plaintiff had a follow-up appointment with Dr. Jeffrey Bell for his left thigh wound. While Plaintiff's abdominal pain had resolved, he complained of blurred vision and back pain. He was instructed to continue wound care. (Tr. 415). A few days later on July 31, 2012, Plaintiff had a follow-up appointment with Dr. Rouse for his insulin-dependent diabetes. Dr. Rouse instructed him to use only long-acting insulin, beginning with 10 units at night and adding one unit until desired levels were reached. Labs were to be repeated in two weeks. (Tr. 375).

On August 6, 2012, Plaintiff saw Dr. Kellar for his appendectomy post-op appointment. Dr. Kellar noted that Plaintiff was recovering as anticipated and noted fever, hematoma, pain,

6

and redness around the incision site. (Tr. 409). Dr. Bell noted on August 9, 2012, that Plaintiff's thigh wound had completely healed, but that his hernia would need to be repaired in the future. (Tr. 417). On August 14, 2012, Dr. Kellar noted that Plaintiff had completely healed from the appendectomy and that he could return to full activity. (TR. 413).

In an additional follow up appointment with Dr. Rouse, he referred Plaintiff to an endocrinologist, Dr. Prajesh Joshi, for his diabetes. On September 13, 2012, Dr. Joshi noted that Plaintiff was first diagnosed with diabetes during his July 12, 2012 hospital stay, that he was currently working three days (including walking around and laboring), that he was seeing an eye doctor for his vision complaints, and that he was also complaining of back pain. (Tr. 426). Plaintiff's height was six feet, his weight was 293 pounds and his body mass index was 39.81. (Tr. 427). In his assessment, Dr. Joshi opined that Plaintiff's diabetes mellitus was poorly controlled and that he needed to follow his diet more regularly. Dr. Joshi also believed that Plaintiff had type II diabetes and that he should continue to monitor Plaintiff. Dr. Joshi discussed with Plaintiff in detail the importance of his diet. (Tr. 428).

On November 13, 2012, Plaintiff followed up with Dr. Rouse for insulin-dependent diabetes. Dr. Rouse refilled his diabetes medications (Levemir Flexpin, Metformin, and Lisinopril) and ordered additional lab work. (Tr. 430). On February 21, 2013, Plaintiff saw Dr. Rouse for abdominal pain in his right upper quadrant. Dr. Rouse's notes listed current problems as insulin-dependent diabetes and listed medications consisting of Lisinopril, test strips, Nexium, Humalog, and Kombiglyze. (Tr. 543). Dr. Rouse prescribed Tramadol and ordered an ultrasound of Plaintiff's abdomen. (Tr. 544). An ultrasound of Plaintiff's abdomen on February 22, 2013, showed a limited study due to body habitus and overlying bowel gas

7

with portions of midline structures not well seen, horseshoe kidney, hepatic steatosis, and spelomegaly. (Tr. 439-440).

At Dr. Rouse's direction, Plaintiff saw Dr. Kellar for the abdominal pain on February 25, 2013. Dr. Kellar noted that Plaintiff's hernia may be contributing to the pain and advised Plaintiff of the risks of hernia surgery. He also suggested a CT scan and advised Plaintiff that he could return to work in one week. (Tr. 547-548). On May 16, 2013, Plaintiff was complaining of low back pain and right leg pain and saw Dr. Rouse for the symptoms. Dr. Rouse noted that scoliosis could be a factor and ordered an x-ray. He also noted that Plaintiff was "morbidly obese" with a blood pressure reading of 140/80. (Tr. 550). He also prescribed Cyclobenzaprine and hydrocodone/acetaminophen. (Tr. 549-550). The x-ray showed only early degenerative changes, but no acute lumbar spine fracture or malalignment. (Tr. 554). Plaintiff returned to Dr. Rouse on May 23, 2013, for continued symptoms of low back pain. Records indicated that Hydrocodone was not alleviating the pain, so Dr. Rouse prescribed Naproxen. He also ordered MRI of the lumbar spine. (Tr. 551-552). The May 28, 2013, MRI of the lumbar spine showed minimal degenerative changes involving the lumbar spine with a 3 MM central sub ligamentous disc protrusion involving the L5-S1 level. No high grade central canal or neuroforaminal stenosis was identified. (Tr. 553).

**III.    Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must

be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the

national economy given his age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**IV.     Discussion:**

Plaintiff argues the following issues on appeal: 1) the ALJ erred in determining Plaintiff's RFC, and 2) the ALJ erred in determining Plaintiff could return to his past relevant work.

### A.     Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. A review of the record reveals that during the relevant time period, Plaintiff was able to assist with the care of his dogs, prepare simple meals, and perform chores around the house, including mowing the lawn on a riding lawn mower. (Tr. 200-202). Plaintiff could drive a car, pay bills, count

change, handle a savings account and use a checkbook or money order.  (Tr. 203).  He spent time with his wife and a friend at Plaintiff's part-time job.  (Tr. 204). In addition, an overview of the hearing testimony reveals that Plaintiff spent time daily watching television, using a computer approximately seventy-five percent of the time, and playing a Star Trek game on the internet.  He testified that he was able to walk halfway around the track of a football field, go to the grocery store, carry a ten pound bag of groceries to the car, and start a garden.  (Tr. 34-37).

In making a credibility determination, the ALJ also pointed out that Plaintiff at times failed to follow the medical recommendations of his treating and examining physicians. Specifically, Dr. Joshi's notes demonstrate that Plaintiff's diabetes was improperly controlled. The doctor suggested that Plaintiff follow his diet more regularly and counseled him in detail about the importance of his diet. (Tr. 428).  In addition, on a couple of occasions, Plaintiff's doctor noted that he was a smoker and provided Plaintiff with smoking cessation intervention or counseling.  (Tr. 246, 250).  Finally, Dr. Kilambi's notes reveal that Plaintiff had failed to self-dilate, which contributed to an emergency room visit.  (Tr. 360).  Brown v. Barnhart, 390 F.3d 535, 540-541 (8th Cir. 2004)(citations omitted)("Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits."). 20 C.F.R. § 416.930(b).

With respect to Plaintiff's insulin-dependent diabetes diagnosis, the record demonstrates that he is responding to the medical treatment despite the insulin-dependent portion of the diagnosis.  (Tr. 428).   Further, Plaintiff testified that his diabetes has been sufficiently controlled for two to three months without insulin.  (Tr. 41). Impairments that can be controlled with treatment or medication are not disabling. See Estes v. Barnhart, 275 F.3d

11

722, 725 (8th Cir. 2002) (holding that an impairment controllable with treatment or medication is not considered disabling).

It also appears that Plaintiff may be arguing that he suffered from depression. However, many medical records from Plaintiff's primary care physician reveal no findings of depression (Tr. 429, 543, 548-549, 551), nor do the records reveal any history of treatment by mental health professionals.  Therefore, the record also fails to demonstrate that Plaintiff sought on-going and consistent treatment from a mental health professional during the relevant time period.  See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability).

Although it is clear that Plaintiff suffers some degree of limitation, he has not established that he is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### B. ALJ's Residual Functional Capacity Determination

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In finding Plaintiff able to perform a full range of light work, the ALJ considered Plaintiff's subjective complaints, the medical records of his treating and examining physicians, and the evaluations of the examining and non-examining medical examiners. Plaintiff's capacity to perform this level of work is supported by the fact that Plaintiff's examining physicians placed no restrictions on his activities that would preclude him from performing the RFC determined during the relevant time period. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability). In addition to the treating physicians' records, non-examining consultants, Dr. Clarence Ballard and Dr. Janet Cathey, performed an evaluation of the evidence and completed an RFC and case analysis. (Tr. 58-62, 69-73). Dr. Ballard found that Plaintiff had no limitations, and Dr. Cathey found that Plaintiff had the ability to perform a light RFC. After reviewing the entire transcript, the Court finds substantial evidence supporting the ALJ's RFC determination for the time period in question.

### C. Past Relevant Work

Plaintiff has the initial burden of proving that he suffers from a medically determinable impairment which precludes the performance of past work. Kirby v. Sullivan, 923 F.2d 1323, 1326 (8th Cir. 1991). Only after the claimant establishes that a disability precludes performance of past relevant work will the burden shift to the Commissioner to prove that the claimant can perform other work. Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993).

According to the Commissioner's interpretation of past relevant work, a claimant will not be found to be disabled if he retains the RFC to perform:

> 1. The actual functional demands and job duties of a particular past relevant job; *or*
>
> 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

20 C.F.R. §§ 404.1520(e); S.S.R. 82-61 (1982); Martin v. Sullivan, 901 F.2d 650, 653 (8th Cir. 1990)(expressly approving the two part test from S.S.R. 82-61).

Here, the ALJ specifically found that Plaintiff could return to his past relevant work as a manager of a pizza restaurant. In doing so, the ALJ relied upon the opinion of a vocational expert, who opined that Plaintiff's past relevant work as a screen printing machine operator, a sales person of auto accessories, a fast food worker, and a manager of a pizza restaurant were all considered light work in the Dictionary of Occupational Titles. See Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("The testimony of a vocational expert is relevant at steps four and five of the Commissioner's sequential analysis, when the question becomes whether a claimant with a severe impairment has the residual functional capacity to do past relevant work or other work") (citations omitted). In addition to manager of a pizza restaurant, Plaintiff's other past jobs of screen printing machine operator, sales person of auto accessories, and fast food worker would also not exceed his current RFC of light work. Accordingly, the Court finds substantial evidence to support the ALJ's finding that Plaintiff could perform his past relevant work as a manager of a fast food restaurant, as that job is generally performed.

**V.     Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 15th day of January, 2016.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE